Betty Chen (SBN 290588)
bchen@fr.com
FISH & RICHARDSON P.C.
633 West 5th Street, 26th Floor
Los Angeles, CA 90071
Telephone: (213) 533-4240

Jason W. Wolff (SBN 215819)
wolff@fr.com
Elliot N. Scher (*pro hac vice* to be filed)
scher@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (858) 678-5070

Lawrence R. Jarvis (*pro hac vice* to be filed)
jarvis@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree Street, NE, 21st Floor
Atlanta, GA 30309
Telephone: (404) 582-5005

*Attorneys for Plaintiff Microsoft Corporation*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICROSOFT CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MEDIAPOINTE, INC., AMHC, INC., AND STEVEN E. VILLORIA <br><br> Defendant. | Civil Action No. 2:22-cv-1009 <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT, INVALIDITY OF U.S. PATENT NOS. 8,559,426 AND 9,426,195, AND BAD FAITH ASSERTION OF PATENTS** <br><br> DEMAND FOR JURY TRIAL |

Plaintiff Microsoft Corporation ("Microsoft") hereby alleges for its Complaint against Defendants MediaPointe, Inc. ("MediaPointe"), AMHC, Inc. ("AMHC"), and Steven E. Villoria (collectively "Defendants") as follows:

## NATURE AND HISTORY OF THE ACTION

1.      This is an action for a declaratory judgment that Microsoft does not infringe U.S. Patent Nos. 8,559,426 ("'426 Patent") and 9,426,195 ("'195 Patent") (collectively, the "Patents"), and further that the Patents are invalid.  MediaPointe also violated Revised Code of Washington ("RCW") § 19.350 by making bad faith assertions of patent infringement against Microsoft.

2.      On August 16, 2021, MediaPointe filed suit against Microsoft accusing Microsoft of infringing the Patents.  (*See MediaPointe, Inc., v. Microsoft Corp.*, Civil Action No. 6:22-cv-955-ADA (W.D. Tex.) ("WDTX Litigation"), ECF No. 1.).  In so doing, MediaPointe expressly took the position that the claims of the Patents are valid and that they are infringed by Microsoft.

3.      Microsoft informed MediaPointe that it did not appear to have Article III standing soon after the suit was filed, based on the chain of title to the Patents.

4.      MediaPointe insisted it did possess title at the time the lawsuit was filed necessitating Microsoft to spend time and money on litigation activities including analyzing the claims, assessing the infringement contentions served by MediaPointe, and drafting invalidity contentions.

5.     While MediaPointe eventually dismissed its WDTX Litigation against Microsoft without prejudice, it continued to assert that it retained all right to sue Microsoft.

6.     MediaPointe voluntarily dismissed the Litigation without prejudice on February 10, 2022.  It declined to dismiss the suit with prejudice.

7.     MediaPointe's actions have created an actual, justiciable, substantial, and immediate controversy between Microsoft and Defendants as to whether Microsoft's products and/or services infringe any valid claims of the Patents. Moreover, MediaPointe's dismissal of the WDTX Litigation *without prejudice*, demonstrates that it is highly likely one or more of Defendants will again assert infringement of the Asserted Patents against Microsoft.  In the meantime, the cloud of infringement allegations hangs over Microsoft, its products and/or services.

8.     As set forth below, Microsoft does not infringe any valid claim of the Patents.  Therefore, an actual, justiciable, substantial, and immediate controversy exists between the parties as to whether Microsoft's products and/or services infringe any valid claims of the Patents, and whether those patent claims are valid.  A judicial declaration is necessary to determine the respective rights of the parties regarding the Patents, and Microsoft respectfully seeks a judicial declaration that the Patents are not infringed by any Microsoft products and/or services and are invalid.

9.     As set forth below, MediaPointe made bad faith assertions of patent infringement in violation of RCW 19.350 by filing the WDTX Litigation against

Microsoft without sufficient legal basis to do so.  MediaPointe's bad faith assertions of patent infringement resulted in Microsoft spending unnecessary money on legal fees to defend itself against an improper assertion.

## THE PARTIES

10.     Plaintiff Microsoft is a Washington corporation with its principal place of business located at One Microsoft Way, Redmond, Washington 98052.

11.     MediaPointe is a corporation organized and existing under the laws of California.

12.     MediaPointe claims its principal place of business is at 3952 Camino Ranchero, Camarillo, California 93012.

13.     AMHC is a corporation organized and existing under the laws of California.

14.     AMHC claims its principal place of business is at 3952 Camino Ranchero, Camarillo, California 92013.

15.     On information and belief, Steven E. Villoria, who resides in California, is the registered agent for MediaPointe and AMHC.  Mr. Villoria holds himself out as the Chief Executive Officer for both MediaPointe and AMHC.

16.     Shortly after the Lawsuit was filed, Mr. Villoria executed an agreement between MediaPointe and AMHC assigning the Patents to AMHC.  **Exhibit A** (Assignment).  The fact that MediaPointe assigned Patents to AHMC, in what is believed to be a money-free deal after the initiation of the WDTX Litigation is, on

information and belief, a means to insulate potential assets of MediaPointe from potential creditors and judgments in the event of a bankruptcy.

17.     On information and belief, MediaPointe and AMHC, are undercapitalized.  For example, MediaPointe has tax liens against it totaling more than $227,000.  **Exhibit B** (Liens).

18.     On information and belief, MediaPointe and AMHC are the alter egos of Mr. Villoria and exist for Mr. Villoria's benefit.  They possess the same management, substantially the same directors, the same business address, and the same agent for service of process.  MediaPointe and AMHC have attempted to move the Patents between the entities without consideration and in disregard of corporate formalities, including during the prior WDTX Litigation.  For example, in addition to the tax liens, MediaPointe and AMHC have not regularly or timely filed required corporate disclosures in the State of California according to what is shown in the California Secretary of State database.

19.     After the standing issues were identified to MediaPointe, Defendants engaged acts to purportedly "confirm" their title.

20.     On information and belief, Defendants have contacted individuals formerly involved with a non-existent, de-registered entity from Australia known as Streaming Media Australia Party Limited ("SMA").  Defendants claim they hold *a right* to all title and interest to the Patents, and that the individuals formerly involved with SMA have the power to and should make a confirmatory assignment of all right,

title, and interest in the Patents to Defendants so they can again assert the Patents against Microsoft.

## JURISDICTION AND VENUE

21.     This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, under the Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq*. This action also arises under the Patent Troll Prevention Act enacted by the state of Washington at RCW 19.350 prohibiting bad faith assertion of patent infringement.

22.     This Court has subject matter jurisdiction over the claims alleged in this action at least under 28 U.S.C. §§ 1331, 1332, 1338, 2201, and 2202, because this Court has exclusive jurisdiction over declaratory judgment claims arising under the Patent Laws pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.  Moreover, there is complete diversity of the parties, Microsoft is a Washington Corporation and none of the Defendants also reside in Washington.  The amount in controversy for the Washington state law claim exceeds $75,000.

23.     This Court has personal jurisdiction over Defendants because MediaPointe, Inc. is a corporation organized and existing under the laws of California, with its principal place of business alleged to be at 3952 Camino Ranchero, Camarillo, California 93012, and AMHC, Inc. is a California corporation with its principal place business alleged to be at 3952 Camino Ranchero, Camarillo, California 93012.

24.     This Court can provide the relief sought in this Declaratory Judgment Complaint because an actual case and controversy exists between the parties within the scope of this Court's jurisdiction pursuant to 28 U.S.C. § 2201, at least because MediaPointe sued Microsoft alleging patent infringement.  MediaPointe served infringement contentions on Microsoft using Microsoft documents and directing its infringement allegations against the Azure CDN, which was designed, developed, improved, maintained and controlled by Microsoft.  **Exhibit C** (Infringement Contentions).  While MediaPointe dismissed the WDTX Litigation, it did so without prejudice, reserving the right to file a subsequent complaint Microsoft alleging infringement of the same Patents.

25.     Defendant's actions and their continuing efforts to transfer the Patents to Defendants for the purpose of enforcing the Patents against Microsoft, have created an actual, justiciable, substantial, and immediate case or controversy between Microsoft and Defendants.

26.     Venue in this District is proper under 28 U.S.C. §§ 1391(b), (c), and (d) with respect to Microsoft's particular claims against these Defendants.

27.     An actual, justiciable, substantial, and immediate controversy exists under 28 U.S.C. §§ 2201-2202 between Microsoft and Defendants as to whether the Patents are valid and infringed.

## **PATENTS-IN-SUIT**

28.     The '426 patent, entitled "System and Method For Distribution of Data Packets Utilizing An Intelligent Distribution Network," issued on October 15, 2013. A true and correct copy of the '426 patent is attached as **Exhibit D**.

29.     The '195 patent, entitled "System and Method For Distribution of Data Packets Utilizing An Intelligent Distribution Network," issued on August 23, 2016. A true and correct copy of the '195 patent is attached as **Exhibit E**.

## OWNERSHIP OF PATENTS

30.     Defendants allege their title is derived through a series of transactions that ultimately purport to assign all right title and interest to MediaPointe.

31.     The only known purported assignment from both inventors is from 2001 and was made to SMA.

32.     SMA was dissolved or deregistered in Australia in 2003 before transferring whatever rights it had in the Patents to anyone.

33.     In 2005, certain assets of Conferserv, Inc., ("CSI") a corporation organized under the laws of Delaware, were purportedly acquired by Advanced Media Design, Inc. ("AMDI"), a corporation organized under the laws of California. AMDI was organized by Mr. Villoria, who was also a director.  Shortly after the alleged acquisition, CSI was dissolved.

34.     In 2011, AMDI assigned its purported rights in the Patents to AMHC. Mr. Villoria signed for AMDI, the assignor, though the assignment is not countersigned by AMHC, Inc.  Mr. Villoria dissolved AMDI in 2012.

35.     On August 2, 2021, AMDI assigned its purported rights in the Patents to MediaPointe.

36.     On August 25, 2021, days after suing Microsoft for alleged infringement in the WDTX Litigation, MediaPointe assigned its purported rights in the Patents back to AMDI and obtain a license back from AMDI.  *See* **Exhibit A**.

37.     Shortly after the WDTX Litigation was filed, Microsoft notified MediaPointe of a potential standing issue resulting from the break in the chain of title from SMA.  MediaPointe agreed to limited discovery on standing, but requested a several-month delay to begin that discovery.

38.     While the case was awaiting standing discovery to begin, Defendants took affirmative steps to attempt to perfect title, including contacting the individuals formerly associated with SMA to make allegedly "confirmatory" assignments.

39.     After additional questions were raised whether MediaPointe had standing, on February 8, 2022, counsel for MediaPointe continued to allege that MediaPointe does in fact hold all right title and interest to the Patents and explained these efforts in view of questions over whether MediaPointe in fact had title to the Patents.

40.     Specifically, counsel for MediaPointe asserted:

Those documents reflect that Streaming Media Australia Pty, Ltd.'s ("SMA's") request for reinstatement with ASIC was solely for the purpose of "confirm[ing] the asset transfer to [Conferserv, Inc. ("CSI")], and

COMPLAINT
CASE NO. 2:22-cv-1009

subsequently to AMHC," in case "legal title to an asset of SMA may inadvertently not have been included in the migration of the business."

…

The contemporaneous records also state that, through the migration of SMA to the United States, CSI became the "beneficial owner of all right, title, and interest in the Intellectual Property," which appropriately includes then-pending patent application PCT/AU01/00015.

…

This further confirms that as between SMA and CSI, title to the patents-in-suit had vested in CSI, and thereafter, to AMHC.

…

Furthermore, by deregistering shortly after merging with CSI, SMA ensured no other entity could use or assert PCT/AU01/00015. See Corporations Act of 2001 (Cth) s 601AD(2) (Austl.). Not only did SMA's deregistration accord CSI an implied-in-fact exclusive license to PCT/AU01/00015 and its progeny, such a license conferred constitutional standing upon MediaPointe to sue for monetary damages.

## FIRST CLAIM FOR RELIEF

## (Declaratory Judgment That Microsoft Does Not Infringe The '426 Patent)

41.     Microsoft repeats and re-alleges each and every allegation contained in paragraphs 1 through 40 of this Complaint as if fully set forth herein.

42.     In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Microsoft and Defendants regarding whether Microsoft infringes any claim of the '426 patent.

43.     Microsoft does not infringe, and has not infringed, any claim of the '426 patent.  For example, the '426 patent has three independent claims (*i.e.*, claims 1, 2 and 17) and MediaPointe identified claim 1 as an exemplary allegedly infringed claim in its complaint in the WDTX Litigation.  Claim 1 is reproduced below (brackets added):

> [1pre]. A system comprising:
>
> [1a] a management center;
>
> [1b] a plurality of nodes configured to: relay a continuous stream of data from a content provider to a first client in response to an initial request for the continuous stream of data, replicate the continuous stream of data, and transmit the replicated stream of data to at least one other client;
>
> [1c] wherein the management center comprises a mapping engine that is configured to map trace routes between the management center, at least one of the nodes, and at least the first client so as to determine one or more optimal routes from the management center to the first client via the at least one of the nodes, and

[1d] configured to direct a node relaying the continuous stream of data from the content provider to the first client to replicate the continuous stream of data from the content provider, in response to subsequent requests for the continuous stream of data, while the node is relaying the continuous stream of data from the content provider to the first client, and transmit the replicated stream of data to the at least one other client in response to the subsequent requests for the continuous stream of data; and

[1e] wherein the management center is configured to downgrade lower priority clients from a higher quality of service network link to a less optimal network link when a higher priority client requests use of the higher quality of service network link.

44.   Microsoft does not infringe any claims of the '426 patent at least because no Microsoft product or service meets or embodies at least the following claim limitations: [1c] "wherein the management center comprises a mapping engine that is configured to map trace routes between the management center, at least one of the nodes, and at least the first client so as to determine one or more optimal routes from the management center to the first client via the at least one of the nodes"; [1d] "configured to direct a node relaying the continuous stream of data from the content provider to the first client to replicate the continuous stream of data from the content provider, in response to subsequent requests for the continuous stream of data, while

the node is relaying the continuous stream of data from the content provider to the first client, and transmit the replicated stream of data to the at least one other client in response to the subsequent requests for the continuous stream of data"; and [1e] "wherein the management center is configured to downgrade lower priority clients from a higher quality of service network link to a less optimal network link when a higher priority client requests use of the higher quality of service network link."

45.     Microsoft is entitled to judgment declaring that it does not infringe the '426 patent.  Microsoft has no adequate remedy at law.

## **SECOND CLAIM FOR RELIEF**

## **(Declaratory Judgment That Microsoft Does Not Infringe The '195 Patent)**

46.     Microsoft repeats and re-alleges each and every allegation contained in paragraphs 1 through 45 of this Complaint as if fully set forth herein.

47.     In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Microsoft, on the one hand, and Defendants, on the other, regarding whether Microsoft infringes any claim of the '195 patent.

48.     Microsoft does not infringe, and has not infringed, any claim of the '195 patent.  For example, the '195 patent has three independent claims (*i.e.,* claims 1, 13, and 19) and MediaPointe previously identified claim 1 as an exemplary allegedly infringed claim in the complaint in the WDTX Litigation.  Claim 1 is reproduced below (brackets added):

[1pre]. A method comprising:

[1a] receiving an initial request for media content from a first client, the request being received by a management center;

[1b] directing the first client to a node that is selected to relay a content stream from a content provider to the first client by using a mapping engine that maps trace routes between the management center, the node, and the first client, the first client being directed to the node by the management center;

[1c] relaying the content stream from the content provider to the first client via the selected node;

[1d] replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to subsequent requests for the media content from the other clients, the other clients connected to the selected node based on an identification that the selected node is already relaying the content stream from the content provider to the first client; and

[1e] transmitting the replicated content stream from the selected node to at least one other client in response to the subsequent requests for the media content.

49.     Microsoft does not infringe any claims of the '195 patent at least because no Microsoft product or service meets or embodies at least the following

limitations as used in the claimed inventions: [1b] "directing the first client to a node that is selected to relay a content stream from a content provider to the first client by using a mapping engine that maps trace routes between the management center, the node, and the first client, the first client being directed to the node by the management center"; and [1d] "replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to subsequent requests for the media content from the other clients, the other clients connected to the selected node based on an identification that the selected node is already relaying the content stream from the content provider to the first client."

50.    Microsoft is entitled to judgment declaring that it does not infringe the '195 patent.  Microsoft has no adequate remedy at law.

## <u>THIRD CLAIM FOR RELIEF</u>

### <u>(Declaratory Judgment That The '426 Patent Is Invalid)</u>

51.    Microsoft repeats and re-alleges each and every allegation contained in paragraphs 1 through 50 of this Complaint as if fully set forth herein.

52.    In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Microsoft, on the one hand, and Defendants, on the other, regarding whether the '426 patent is valid.

53.    The '426 patent has three independent claims (i.e., claims 1, 2 and 17) and MediaPointe identified claim 1 as an exemplary allegedly infringed claim in its

complaint in the WDTX Litigation.  Claim 1 is reproduced below (it has been annotated with brackets):

[1pre]. A system comprising:

[1a] a management center;

[1b] a plurality of nodes configured to: relay a continuous stream of data from a content provider to a first client in response to an initial request for the continuous stream of data, replicate the continuous stream of data, and transmit the replicated stream of data to at least one other client;

[1c] wherein the management center comprises a mapping engine that is configured to map trace routes between the management center, at least one of the nodes, and at least the first client so as to determine one or more optimal routes from the management center to the first client via the at least one of the nodes, and

[1d] configured to direct a node relaying the continuous stream of data from the content provider to the first client to replicate the continuous stream of data from the content provider, in response to subsequent requests for the continuous stream of data, while the node is relaying the continuous stream of data from the content provider to the first client, and transmit the replicated stream of data to the at least one other

client in response to the subsequent requests for the continuous stream of data; and

[1e] wherein the management center is configured to downgrade lower priority clients from a higher quality of service network link to a less optimal network link when a higher priority client requests use of the higher quality of service network link.

54.   Claim 1 is invalid as anticipated and obvious in view of at least U.S. Patent No. 6,832,253 to Auerbach, which qualifies as prior art under pre-AIA 35 U.S.C. § 102(a), (e) and (g)(2).  A true and correct copy of Auerbach is attached as Exhibit F.

55.   Auerbach teaches a system with a management center as recited in [1a]. For example, Auerbach teaches:

"The present invention addresses this need by orchestrating the propagation or positioning of content based upon "proximity" between various nodes on a network. The nodes between which the content is propagated include, but are not limited to, content libraries, servers, and clients. In one case, the relative proximities of two content servers to a particular client or group of clients determines which of these servers serves client requests. In another case, the invention employs anticipatory loading of content from a library to a server based upon the

server's proximity to a given client-base. Yet another application involves adding or removing server capacity to a network based upon proximity to clients. Still another application applies proximity affects to modify cache release algorithms that decide which pieces of content to remove from a cache (e.g., a server). Preferably, a network entity referred to herein as a "content control system" calculates proximity dynamically and automatically decides whether to move content based upon the proximity calculation." *Id.* at 2:10-29.

"The invention requires that some entity or group of entities be configured or designed to determine proximity or relative proximity and decide where and when to propagate content. In the discussion herein, entities configured or designed for these functions are referred to as 'content control Systems.' Various hardware entities may be configured or designed as content control systems." *Id*. at 5:39-45.

"Referring now to FIG. 5, a router 510 suitable for implementing the present invention includes a master central processing unit (CPU) 562, interfaces 568, and a bus 515 (e.g., a PCI bus). When acting under the control of appropriate software or firmware, the CPU 562 is responsible for such router tasks as routing table computations and network management. It may also be responsible for measuring, calculating or approximating network proximity and controlling content

COMPLAINT
CASE NO. 2:22-cv-1009

propagation, etc." *Id*. at 14:29-49 37.  *See also* Figs. 5, 6, 4:11-24, 5:66-6:14, 7:31-62.

56.     Auerbach teaches a system with a plurality of nodes as recited in [1b]. For example, Auerbach teaches:

> "Another aspect of the invention relates to methods of selecting a server to fill a client request for content. Such methods may be characterized by the following sequence: (a) determining that one or more clients need or will need to receive the content;(b) determining a first proximity between the one or more clients and a first server capable of supplying the content; (c) determining a second proximity between the one or more clients and a second server capable of supplying the content; and (d) based upon the relative values of the first and second proximities, choosing one of the first and second servers to fill client requests for the content. Preferably, the content is media content such as video titles." *Id.* at 3:41-53.

> "At this point, the content control system has all the information it needs to make a decision regarding the use of the first or second server. At 254, it chooses one server for loading or serving content based upon two or more of the proximities determined above. The process is then complete. Note that the content controller may thereafter

initiate serving of the content or moving the content." *Id.* at 7:56-62.

See also Fig. 2A, 5:66-6:14, 6:41-64,

57.    Auerbach teach the system's management center comprises a mapping engine that is configured to map trace routes to determine an optimal route as recited in [1c].  For example, Auerbach teaches:

> "Preferably, a network entity referred to herein as a 'content control system' calculates proximity dynamically and automatically decides whether to move content based upon the proximity calculation." *Id.* at 2:25-29.

> "The invention requires that some entity or group of entities be configured or designed to determine proximity or relative proximity and decide where and when to propagate content. In the discussion herein, entities configured or designed for these functions are referred to as 'content control Systems.' Various hardware entities may be configured or designed as content control systems." *Id.* at 5:39-45.

> "Other variations on the basic 'ping' facility may be employed to extract desired proximity information. For example, the ping message may set the 'Type-of-Service' or 'Quality of Service' bits in the IP header and IP options. Ping tests should be used carefully across the Internet and complex corporate nets because the path may not be symmetrical, i.e. the outbound and inbound packets may take vastly

different routes. (This is why 'traceroute' or other actual route/path determining mechanisms are useful additions to basic 'ping' information.)" *Id.* at 9:41-51 50.

"Traceroute: Another way of determining proximity is via a standard traceroute. This shows the actual sequence of routers that a packet passes through. A traceroute packet expires after a defined number of hops (e.g., 10). The router that gets the packet on its final hop sends a message notifying the source of the path of that the packet took. In the following example of a traceroute notice that it shows each hop and some round trip times to that particular hop. Note that there are typically three probes at each TTL value. Hence the three round trip times shown below." *Id*. at 10:43-52, see also *id.* at 10:53-11:8, 11:44-46.

"Referring now to FIG. 5, a router 510 suitable for implementing the present invention includes a master central processing unit (CPU) 562, interfaces 568, and a bus 515 (e.g., a PCI bus). When acting under the control of appropriate software or firmware, the CPU 562 is responsible for such router tasks as routing table computations and network management. It may also be responsible for measuring, calculating or approximating network proximity and controlling content

propagation, etc." *Id.* at 14:29-37. *See also id.* at Figs. 5, 6, 2:30-51, 3:14-24, 3:41-53, 4:11-24, 5:66-6:14, 6:41-64, 7:31-62, 8:4-9:50.

58.    Auerbach teaches the management center is configured to direct a node to replicate the continuous stream of data and transmit the replicated stream of data to another client in response to subsequent requests.  For example, Auerbach teaches:

> "Another aspect of the invention relates to methods of selecting a server to fill a client request for content. Such methods may be characterized by the following sequence: (a) determining that one or more clients need or will need to receive the content;(b) determining a first proximity between the one or more clients and a first server capable of supplying the content; (c) determining a second proximity between the one or more clients and a second server capable of supplying the content; and (d) based upon the relative values of the first and second proximities, choosing one of the first and second servers to fill client requests for the content. Preferably, the content is media content such as video titles." *Id.* at 3:41-53.

> "At this point, the content control system has all the information it needs to make a decision regarding the use of the first or second server. At 254, it chooses one server for loading or serving content based upon two or more of the proximities determined above. The

process is then complete. Note that the content controller may thereafter initiate serving of the content or moving the content." *Id*. at 7:56-62.

See also Fig. 2A, 5:66-6:14, 6:41-64, 7:31-55.

In one embodiment, Auerbach teaches that routing and replication and be performed dynamically, at run-time, while considering factors such as "bandwidth, number of hops, congestion, noise and loss on a network segment, and charges incurred to send." *Id*. at 3:14-17. Auerbach further states that server capacity can added or removed in response to such proximity factors. *Id*. at 2:20-21. However, Auerbach does not expressly say whether replication is conditional—more specifically, that is it is "in response to a subsequent requests," or it occurs while a node is already streaming the requested content.

59.     It would have been obvious to a person of ordinary skill in the art at the time to conditionally replicate the stream in response to a subsequent request, while the node was already relaying the stream to another client. Auerbach expressly teaches considering various load parameters, and the ability to dynamically change the server capacity. A person of ordinary skill in the art at the time of the invention would understand it is a design choice as to whether to automatically or conditionally replicate the stream. And conditionally replicating the stream in response to another request for the same content, while it is being relayed by a selected node, could conserve memory on the relay node as compared to automatically replicating. Moreover, if it was done while the selected node was

already relaying the stream, it could piggy back on the stream data already present on that node.  This technique was known in the art, as demonstrated by U.S. Patent No. 5,544,327 to Dan, which is attached as **Exhibit G**.  For example, Dan teaches that multiple, sequential requests for the same video stream can be served from the same node, including while the node is already streaming the content:

> "In step 230, the buffer manager scans the movie list 170 to determine the closest preceding stream if any for the movie; i.e. the stream among all the streams reading this movie whose current block is closest to the current block of this request."  Dan at 5:14-19.

> "If the request falls between two requests where the following request is being served from a buffer, the current stream can also be served from the buffer."  Dan at 4:20-23

It would have been obvious for a person of ordinary skill in the art to conditionally replicate the stream as recited in limitation [1d] as taught in Auerbach in further view of Dan because it is a design choice for a person of ordinary skill in the art at the time to reuse data using the replicating techniques in Auerbach with the timing techniques well-known in the art and taught by Dan.  Thus Auerbach in view of Dan renders limitation [1d] obvious.

60.    Auerbach teaches the management center is configured to consider Quality of Service bits in the IP header.  For example, Auerbach teaches:

"Other variations on the basic 'ping' facility may be employed to extract desired proximity information. For example, the ping message may set the 'Type-of-Service' or 'Quality of Service' bits in the IP header and IP options. Ping tests should be used carefully across the Internet and complex corporate nets because the path may not be symmetrical, i.e. the outbound and inbound packets may take vastly different routes. (This is why 'traceroute' or other actual route/path determining mechanisms are useful additions to basic 'ping' information.)" *Id.* at 9:41-51 50.

While Auerbach acknowledges Quality of Service information can be included in the packet header, Auerbach does not expressly say it also downgrades lower priority clients when a higher priority client requests use of a particular link.

61.     To a person of ordinary skill in the art at the time of the invention, limitation downgrading a lower priority client when a higher priority client request is received as recited in [1e] would have been obvious at the time of the invention. Such a person would have understood the Quality of Service bits and IP header information could be used to selectively upgrade or downgrade clients based on their priority, as is recited in [1e].  Such knowledge was known in the art at the time, as evidenced by U.S. Patent No. 7,334,044, to Allen, which is attached as **Exhibit H**. Allen teaches that various priority of clients can have different service level

agreements for quality of service, and that one client get a higher priority link over

another,  For example, Allen teaches:

> "For example, basic clients might well consume all available
>
> bandwidth (300) in the absence of any premium customers, yet could be
>
> throttled back toward their floor flow rates (which together cannot
>
> exceed 200 in this example) at any time should any premium customers
>
> suddenly demand service."  Allen at 16:57-62.

It would have been obvious to a person of ordinary skill in the art at the time to

modify Auerbach consistent with its teachings regarding Quality of Service

information in the packets, and to further implement priority levels for clients to

satisfy those Quality of Service levels given the resource constraints any streaming

system, such as Auerbach, particularly in view of the teachings in Allen.  This is, at

base, a routine design choice premised on a business decision to improve the quality

of service for premium clients at the expense of lesser priority clients.  Thus

Auerbach in view of Allen renders limitation [1e] obvious.

62.     Accordingly, exemplary claim 1 of the '426 Patent invalid under 35

U.S.C. § 103 over Auerbach alone, and also in view of Dan and Allen.

63.     Furthermore, claim 1 of the '426 Patent is invalid under 35 U.S.C. §

112, including for its use of the subjective term "optimal" and "less optimal" without

the specification providing enough certainty to one of skill in the art when read in the

context of the invention, and without sufficient detail to show the named inventors

sufficiently possessed and described the full scope of these terms.  The expression "optimal" is not defined in the claims or specification of the patent.  While the specification describes, "data travel[ing] through more devices (and thus more hops) than would otherwise be optimal" ('426 pat. at 2:51-53), it does not describe what makes one or more routes "optimal" or how to determine an "optimal" route, or what a "less optimal network link" is.  Thus, there is no basis revealed in the patent by which one would be able to say that a route or link is "optimal" or not.

64.     Microsoft is entitled to judgment declaring that the '426 patent is invalid under 35 U.S.C. §§ 103 and 112.  Microsoft has no other adequate remedy at law.

## **FOURTH CLAIM FOR RELIEF**

### **(Declaratory Judgment That The '195 Patent Is Invalid)**

65.     Microsoft repeats and re-alleges each and every allegation contained in paragraphs 1 through 64 of this Complaint as if fully set forth herein.

66.     In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Microsoft, on the one hand, and Defendants, on the other, regarding whether any the '195 patent is valid.

67.     The '195 patent has 3 independent claims (i.e., claims 1, 13 and 19) and MediaPointe identified claim 1 as an exemplary allegedly infringed claim in its complaint in the WDTX Litigation.  Claim 1 is reproduced below (which has been annotated with brackets):

[1pre]. A method comprising:

[1a] receiving an initial request for media content from a first client, the request being received by a management center;

[1b] directing the first client to a node that is selected to relay a content stream from a content provider to the first client by using a mapping engine that maps trace routes between the management center, the node, and the first client, the first client being directed to the node by the management center;

[1c] relaying the content stream from the content provider to the first client via the selected node;

[1d] replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to subsequent requests for the media content from the other clients, the other clients connected to the selected node based on an identification that the selected node is already relaying the content stream from the content provider to the first client; and

[1e] transmitting the replicated content stream from the selected node to at least one other client in response to the subsequent requests for the media content.

68. Claim 1 is invalid as anticipated and obvious in view of U.S. Patent No. 6,832,253 to Auerbach, which qualifies as prior art under pre-AIA 35 U.S.C. § 102(a), (e) and (g)(2).

69.     Auerbach teaches a receiving an initial request for media content at management center as recited in [1a].  For example, Auerbach teaches:

"The present invention addresses this need by orchestrating the propagation or positioning of content based upon 'proximity' between various nodes on a network. The nodes between which the content is propagated include, but are not limited to, content libraries, servers, and clients. In one case, the relative proximities of two content servers to a particular client or group of clients determines which of these servers serves client requests. In another case, the invention employs anticipatory loading of content from a library to a server based upon the server's proximity to a given client-base. Yet another application involves adding or removing server capacity to a network based upon proximity to clients. Still another application applies proximity affects to modify cache release algorithms that decide which pieces of content to remove from a cache (e.g., a server). Preferably, a network entity referred to herein as a "content control system" calculates proximity dynamically and automatically decides whether to move content based upon the proximity calculation." *Id*. at 2:10-29.

"Another aspect of the invention relates to methods of selecting a server to fill a client request for content. Such methods may be characterized by the following sequence: (a) determining that one or

more clients need or will need to receive the content; (b) determining a first proximity between the one or more clients and a first server capable of supplying the content; (c) determining a second proximity between the one or more clients and a second server capable of supplying the content; and (d) based upon the relative values of the first and second proximities, choosing one of the first and second servers to fill client requests for the content. Preferably, the content is media content such as video titles." *Id.* at 3:41-53.

"The invention requires that some entity or group of entities be configured or designed to determine proximity or relative proximity and decide where and when to propagate content. In the discussion herein, entities configured or designed for these functions are referred to as 'content control Systems.' Various hardware entities may be configured or designed as content control systems." *Id*. at 5:39-45.

"Referring now to FIG. 5, a router 510 suitable for implementing the present invention includes a master central processing unit (CPU) 562, interfaces 568, and a bus 515 (e.g., a PCI bus). When acting under the control of appropriate software or firmware, the CPU 562 is responsible for such router tasks as routing table computations and network management. It may also be responsible for measuring, calculating or approximating network proximity and controlling content

propagation, etc." *Id.* at 14:29-49 37.  *See also* Figs. 2A, 5, 6, 4:11-24, 5:66-6:14, 7:31-62.

70.     Auerbach teaches directing the client to a node selected to relay a content stream from a content provider to the client by using a mapping engine that maps traceroutes, as recited in [1b].  For example, Auerbach teaches:

> "The present invention addresses this need by orchestrating the propagation or positioning of content based upon "proximity" between various nodes on a network. The nodes between which the content is propagated include, but are not limited to, content libraries, servers, and clients. In one case, the relative proximities of two content servers to a particular client or group of clients determines which of these servers serves client requests. In another case, the invention employs anticipatory loading of content from a library to a server based upon the server's proximity to a given client-base. Yet another application involves adding or removing server capacity to a network based upon proximity to clients. Still another application applies proximity affects to modify cache release algorithms that decide which pieces of content to remove from a cache (e.g., a server). Preferably, a network entity referred to herein as a "content control system" calculates proximity dynamically and automatically decides whether to move content based upon the proximity calculation." *Id.* at 2:10-29.

COMPLAINT
CASE NO. 2:22-cv-1009

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Other variations on the basic 'ping' facility may be employed to extract desired proximity information. For example, the ping message may set the 'Type-of-Service' or 'Quality of Service' bits in the IP header and IP options. Ping tests should be used carefully across the Internet and complex corporate nets because the path may not be symmetrical, i.e. the outbound and inbound packets may take vastly different routes. (This is why 'traceroute' or other actual route/path determining mechanisms are useful additions to basic 'ping' information.)" *Id.* at 9:41-51 50.

"Traceroute: Another way of determining proximity is via a standard traceroute. This shows the actual sequence of routers that a packet passes through. A traceroute packet expires after a defined number of hops (e.g., 10). The router that gets the packet on its final hop sends a message notifying the source of the path of that the packet took. In the following example of a traceroute notice that it shows each hop and some round trip times to that particular hop. Note that there are typically three probes at each TTL value. Hence the three round trip times shown below." *Id*. at 10:43-52, *see also id.* at 10:53-11:8, 11:44-46.

"Referring now to FIG. 5, a router 510 suitable for implementing the present invention includes a master central processing unit (CPU)

562, interfaces 568, and a bus 515 (e.g., a PCI bus). When acting under the control of appropriate software or firmware, the CPU 562 is responsible for such router tasks as routing table computations and network management. It may also be responsible for measuring, calculating or approximating network proximity and controlling content propagation, etc." *Id.* at 14:29-37. *See also id.* at Figs. 5, 6, 2:30-51, 3:14-24, 3:41-53, 4:11-24, 5:66-6:14, 6:41-64, 7:31-62, 8:4-9:50.

71.     Auerbach teaches relaying the content stream from the content provider to the first client via the selected node as recited in [1c].  For example, Auerbach teaches:

"Another aspect of the invention relates to methods of selecting a server to fill a client request for content. Such methods may be characterized by the following sequence: (a) determining that one or more clients need or will need to receive the content;(b) determining a first proximity between the one or more clients and a first server capable of supplying the content; (c) determining a second proximity between the one or more clients and a second server capable of supplying the content; and (d) based upon the relative values of the first and second proximities, choosing one of the first and second servers to fill client requests for the content. Preferably, the content is media content such as video titles." *Id*. at 3:41-53.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"At this point, the content control system has all the information it needs to make a decision regarding the use of the first or second server. At 254, it chooses one server for loading or serving content based upon two or more of the proximities determined above. The process is then complete. Note that the content controller may thereafter initiate serving of the content or moving the content." *Id*. at 7:56-62. *See also* Fig. 2A, 5:66-6:14, 6:41-64, 7:31-55.

72.     Auerbach teaches the management center is configured to replicate the content stream for other client.  For example, Auerbach teaches:

"Another aspect of the invention relates to methods of selecting a server to fill a client request for content. Such methods may be characterized by the following sequence: (a) determining that one or more clients need or will need to receive the content;(b) determining a first proximity between the one or more clients and a first server capable of supplying the content; (c) determining a second proximity between the one or more clients and a second server capable of supplying the content; and (d) based upon the relative values of the first and second proximities, choosing one of the first and second servers to fill client requests for the content. Preferably, the content is media content such as video titles." *Id*. at 3:41-53.

"At this point, the content control system has all the information it needs to make a decision regarding the use of the first or second server. At 254, it chooses one server for loading or serving content based upon two or more of the proximities determined above. The process is then complete. Note that the content controller may thereafter initiate serving of the content or moving the content." *Id*. at 7:56-62. See also Fig. 2A, 5:66-6:14, 6:41-64, 7:31-55.

In one embodiment, Auerbach teaches that replication and be performed dynamically, at run-time, while considering factors such as "bandwidth, number of hops, congestion, noise and loss on a network segment, and charges incurred to send." *Id*. at 3:14-17. Auerbach further states that server capacity can added or removed in response to such proximity factors. *Id*. at 2:20-21. However, Auerbach does not expressly say whether replication is conditional—more specifically, that it is "in response to a subsequent requests," or it occurs while a node is already streaming the requested content.

73.    It would have been obvious to a person of ordinary skill in the art at the time to conditionally replicate the stream in response to a subsequent request, while the node was already relaying the stream to another client. Auerbach expressly teaches considering various load parameters, and the ability to dynamically change the server capacity. A person of ordinary skill in the art at the time of the invention would understand it is a design choice as to whether to automatically or

conditionally replicate the stream.  And conditionally replicating the stream in response to another request for the same content, while it is being relayed by a selected node, could conserve memory on the relay node as compared to automatically replicating.  Moreover, if it was done while the selected node was already relaying the stream, it could piggy back on the stream data already present on that node.  This technique was known in the art, as demonstrated by U.S. Patent No. 5,544,327 to Dan, which is attached as **Exhibit G**.  For example, Dan teaches that multiple, sequential requests for the same video stream can be served from the same node, including while the node is already streaming the content:

> "In step 230, the buffer manager scans the movie list 170 to determine the closest preceding stream if any for the movie; i.e. the stream among all the streams reading this movie whose current block is closest to the current block of this request."  Dan at 5:14-19.

> "If the request falls between two requests where the following request is being served from a buffer, the current stream can also be served from the buffer."  Dan at 4:20-23

It would have been obvious for a person of ordinary skill in the art to conditionally replicate the stream as recited in limitation [1d] as taught in Auerbach in further view of Dan because it is a design choice for a person of ordinary skill in the art at the time to reuse data using the replicating techniques in Auerbach with the timing

techniques well-known in the art and taught by Dan. Thus Auerbach in view of Dan renders limitation [1d] obvious.

74.    Auerbach teaches transmitting the replicated content stream from the selected node to another client in response to the subsequent requests for the media content as recited in [1e]. For example, Auerbach teaches:

> "Another aspect of the invention relates to methods of selecting a server to fill a client request for content. Such methods may be characterized by the following sequence: (a) determining that one or more clients need or will need to receive the content;(b) determining a first proximity between the one or more clients and a first server capable of supplying the content; (c) determining a second proximity between the one or more clients and a second server capable of supplying the content; and (d) based upon the relative values of the first and second proximities, choosing one of the first and second servers to fill client requests for the content. Preferably, the content is media content such as video titles." *Id.* at 3:41-53.

> "At this point, the content control system has all the information it needs to make a decision regarding the use of the first or second server. At 254, it chooses one server for loading or serving content based upon two or more of the proximities determined above. The process is then complete. Note that the content controller may thereafter

initiate serving of the content or moving the content." *Id*. at 7:56-62.

*See also* Fig. 2A, 5:66-6:14, 6:41-64, 7:31-55.

75.     Accordingly, exemplary claim 1 of the '195 Patent is invalid under 35 U.S.C. § 103 over Auerbach alone, and further in view of Dan.

76.     Furthermore, claims 2, 13, and 19 of the '195 Patent are invalid under 35 U.S.C. § 112, for its use of subjective terms "most efficient network link," "optimal delivery route," and "best route" without the specification providing enough certainty to one of skill in the art when read in the context of the invention, and also without sufficient detail to show the named inventors sufficiently possessed and described the full scope of these terms.  For example, the expression "best" is not defined in the claims or specification of the patent.  While the specification describes "using the best performing nodes and links to stream the content" ('195 Patent at 4:12-15), it does not describe what means to be "best," which is subjective. Thus, there is no basis revealed in the patent by which one would be able to say that a node is the "best."

77.     Similarly, and as discussed previously, the expression "optimal" is not defined in the claims or specification of the patent.  While the specification describes, "data travel[ing] through more devices (and thus more hops) than would otherwise be optimal" ('195 Patent at 2:55-57), it does not describe what makes one or more routes "optimal" or what an "optimal delivery route" is.  Thus, there is no basis revealed in the patent by which one would be able to say that a route or link is "optimal" or not.

78.     Furthermore, the term "efficient" necessarily means that some criteria is needed to determine whether a network link is or is not efficient.  While the specification describes "manag[ing] the system such that the most efficient route between content provider 202 and client 214 will be utilized" ('195 Patent at 4:55-57), it does not describe what makes a network link "efficient" or not, much less what the "most efficient network link" is.  For example, is the most efficient network link the one provides the fastest delivery for priority communications or lowest overall delay for all communications?  The patent does not provide an answer to determining what "most efficient network link" is.  Thus, there is no basis revealed in the patent by which one would be able to say that a network link is the "most efficient."

79.     Microsoft is entitled to judgment declaring that the '195 Patent is invalid under 35 U.S.C. §§ 103 and 112.  Microsoft has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

### (Bad Faith Assertions of Patent Infringement, RCW 19.350)

80.     Microsoft repeats and re-alleges each and every allegation contained in paragraphs 1 through 79 of this Complaint as if fully set forth herein.

81.     As recited above, the Defendants, did not have a sufficient legal basis to bring the WDTX Litigation against Microsoft in the Western District of Texas.  The chain of title was broken at SMA and MediaPointe did not have legal right to sue Microsoft.

82.     Moreover, when Defendants filed the WDTX Litigation against Microsoft, the Complaint and its subsequent Infringement Contentions completely omit any reference to how the trace route limitations are allegedly satisfied by Microsoft's accused products.  See Exhibit C, '426 Chart at 10-12 and '195 Chart at 7-8.

83.     Further, MediaPointe's infringement allegations in the Complaint and in its subsequent Infringement Contentions also fail to identify how Microsoft's accused products satisfy the conditional replication limitations (*e.g.,* "in response to subsequent requests" and "while the node is relaying"), and instead point to Microsoft documents that say the opposite occurs.  *Id*. at '426 Chart, 12-13 (see in particular the diagram and text at 13 which says at step 4 the "edge server in the POP caches the file" in response to the first request by Alice before returning the content to Alice so requests by other users will be served from the same previously cached copy at steps 5 and 6), '195 Chart at 10-11.

84.     Additionally, MediaPointe's infringement allegations in the Complaint and in its subsequent Infringement Contentions disregard the express language of, for example, claim 1 of the '426 Patent, which requires the management center to "downgrade lower priority clients from a higher quality of service network link to a less optimal network link when a higher priority client requests use of the higher quality of service link."  Id., '426 Chart at 16-18.

85. MediaPointe claims this "downgrading" limitation is satisfied when there is a network failure. However, the limitation refers to moving lower priority clients off of the higher priority link because a higher priority client requests use that link. MediaPointe's infringement contentions willfully ignore and are an objectively unreasonable interpretation of this limitation. See Id. at 16 (repeating its allegations for trace routes, but with evidence that does not even refer to trace routes), 17 (referring to FrontDoor, which is a different product and the excerpt refers to backend servers, which are the opposite of clients), and 18 (referring to yet another product, and pointing to a server failure as opposed to any client priority). There is no reference to client priority in MediaPointe's infringement allegations, or moving a lower priority client from a link so a higher priority client could use it.

86. MediaPointe's bad faith assertion of patent infringement forced Microsoft to spend time and money on litigation activities including analyzing the claims, assessing the infringement contentions served by MediaPointe, and drafting invalidity contentions.

87. MediaPointe's infringement allegations were objectively baseless and absurdly overbroad. Its assertions of baseless claims of infringement when it did not even have the right to make such claims constitutes a bad faith assertion of patent infringement under RCW 19.350.

## **PRAYER FOR RELIEF**

Microsoft respectfully requests the following relief:

A. That the Court enter a judgment declaring that Microsoft has not infringed and does not infringe any claim of the '426 patent;

B. That the Court enter a judgment declaring that each claim of the '426 patent is invalid;

C. That the Court enter a judgment declaring that Microsoft has not infringed and does not infringe any claim of the '195 patent;

D. That the Court enter a judgment declaring that each claim of the '195 patent is invalid;

E. Enjoin Defendants from threatening Microsoft and its customers using its products and/or services for alleged infringement of the Patents;

F. That the Court declare that this case is exceptional under 35 U.S.C. § 285 and award Microsoft its attorneys' fees, costs, and expenses incurred in this action;

G. That the Court award Microsoft any and all other relief to which Microsoft may show itself to be entitled, including but not limited its costs and fees for the prior Litigation; and

H. That the Court award Microsoft any other relief as the Court may deem just, equitable, and proper.

## **JURY DEMAND**

Microsoft hereby demands a jury trial on all issues and claims so triable.

COMPLAINT
CASE NO. 2:22-cv-1009

Dated:  February 14, 2022          FISH & RICHARDSON P.C.


                                   By:   */s/  Betty Chen*
                                         Betty Chen

                                         *Attorney for Plaintiff*
                                         MICROSOFT CORPORATION